**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA
*ex rel.* [UNDER SEAL],

Plaintiff,

v.

[UNDER SEAL],

Defendants.

Case No.

**FALSE CLAIMS ACT COMPLAINT**

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

JURY TRIAL DEMANDED

**DOCUMENT TO BE KEPT UNDER SEAL**

Li Yu
**DiCello Levitt LLP**
485 Lexington Avenue, Suite 1001
New York, NY 10017
(646) 933-1000
lyu@dicellolevitt.com
*Attorneys for Plaintiff-Relator*

Bianca Beam
**Bianca Beam Law**
1 N 4th Place
Brooklyn, NY 11249
bbeam@biancabeamlaw.com

**UNITED STATES DISTRICT COURT FOR**
**THE SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,
*ex rel.* 537 HOLDINGS LLC,

Plaintiff-Relator,

v.

CARAVEL MANAGEMENT LLC; CARAVEL PARTNERS, LLC; CARAVEL EGYPTIAN TREASURY FUND LP; and JAMES A. HARMON;

Defendants.

Case No. ___________

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729–3733**

***QUI TAM* ACTION FILED *IN CAMERA* AND UNDER SEAL AS REQUIRED BY 31 U.S.C. § 3730(b)(2)**

**JURY TRIAL DEMANDED**

## I. PRELIMINARY STATEMENT

1. This is a civil fraud action brought on behalf of the United States (the "Government") by relator 537 Holdings LLC ( "Relator") pursuant to the False Claims Act, 31 U.S.C. § 3729 *et seq*. ("FCA"), to recover treble damages sustained by, and civil penalties owed to, the Government relating to fraud by defendants Caravel Management, LLC ("Caravel Management"); Caravel Partners LLC ("Caravel Partners"); Caravel Egyptian Treasury Fund, LP ("Caravel Fund"); James A. Harmon, the Chairman of the Egyptian-American Enterprise Fund ("EAEF"), the managing member of Caravel Management and Caravel Partners, and a principal of the Caravel Fund.

2. By way of background, EAEF is a government-funded non-profit entity established in 2013 pursuant to the Consolidated Appropriations Act of 2012, Pub. L. 112-74. Between 2013 and 2021, EAEF received $300 million of grant funds from the U.S. Treasury.

3. The U.S. Agency for International Development ("USAID") gave those grant funds to EAEF to further two federal interests—one, to stimulate growth in the Egyptian private sector and, two, to help Egypt achieve long-term sustainable economic development. Under the terms of its grant from USAID, EAEF is obligated to begin liquidating its investments in December 2028 and to return at least 50% of the proceeds to the U.S. Treasury.

4. To ensure proper use of federal funding, Congress prohibited EAEF's directors and officers like James Harmon from using EAEF funds for their own private benefit. *See* 22 U.S.C. § 5421(l) (incorporated by reference by Pub. L. 112-74 § 7401(b)). The terms of USAID's grant to EAEF, in turn, prohibited Harmon from engaging in transactions tainted by conflicts of interest without fully disclosing the conflicts to USAID and seeking approval.

5. In practice, however, James Harmon and the other Defendants ignored these material statutory and grant requirements. Instead, Harmon treated EAEF as his personal fiefdom

and regularly used EAEF funds to engage in conflicted transactions with his personal businesses—Caravel Management and Caravel Fund—and with Artemis Real Estate Partners ("Artemis), his daughter Deborah Harmon's firm, without fully disclosing the conflicts to USAID or seeking USAID approval. These conflicted transactions inured to the private benefit of the Harmon family at the expense of the public fisc.

6. *First*, since 2019, James Harmon has caused EAEF to pay more than $2 million in salaries and benefits of two individuals who primarily work on Harmon's Caravel and other outside businesses instead of EAEF. Specifically, James Harmon had EAEF pay substantially all of the salaries and benefits for Margaret Engelhardt, Caravel Management's chief compliance officer and chief administrative officer, and the salary and benefits of Fiona Mora, James Harmon's assistant at Caravel Management who also handles Harmon's personal business.

7. By saddling EAEF with the salaries and benefits of Engelhardt and Mora, Harmon violated the statutory prohibition against using EAEF funds for his personal benefit. Harmon also violated the terms of USAID's grant by not fully disclosing these direct conflicts of interest to USAID and seeking approval. Further, Harmon had Engelhardt make false statements in 2020 in EAEF's records concerning her and Mora's salaries from EAEF to conceal this conflict.

8. *Second*, James Harmon also has improperly caused EAEF to spend hundreds of thousands of dollars on office rental to subsidize his outside business, Caravel Management, and Artemis, his daughter Deborah Harmon's firm.

9. Specifically, between September 2022 and September 2024, James Harmon made EAEF overpay Artemis to sublease an area of the 30th floor at 888 Seventh Avenue in Manhattan and then to sublease a substantial amount of that space to Caravel Management at a discounted rate with better terms. Since October 2024, moreover, James Harmon has taken the further step of

having EAEF pay the full cost of office rental—more than $32,000 per month—while allowing Caravel Management to use portions of the office space for free.

10. By shifting the office rental costs from his outside business, Caravel Management, and Artemis, his daughter's firm, to EAEF, James Harmon violated the statutory prohibition against using EAEF funds for his personal benefit. Harmon also violated the terms of USAID's grant by not fully disclosing the direct conflicts of interest to USAID and seeking approval.

11. *Third*, between August and October 2022, when Egypt was in a currency crisis, James Harmon improperly exploited his dual roles as the Chairman of EAEF and the managing member of the Caravel Fund to expedite the sale of millions of dollars' worth of Egyptian Treasury Bills ("Egyptian T-Bills") by Caravel at the expense of EAEF's ability to do so.

12. Specifically, starting in July 2019, EAEF used its investment proceeds in Egypt to purchase Egyptian T-Bills as a cash-management strategy. In January 2021, James Harmon made EAEF move its Egyptian T-Bill holdings to HC Securities & Investment ("HC Securities"), a brokerage firm in Cairo, that Harmon already was using to handle the Caravel Fund's Egyptian T-Bill holdings.

13. In late July and early August 2022, as concerns about the value of Egypt's currency mounted, EAEF's chief financial officer ("CFO") directed HC Securities to liquidate EAEF's Egyptian T-Bill holdings. On August 16, 2022, however, James Harmon countermanded that directive and told HC Securities to wait until "a new IMF agreement [is] announced [in] mid October." In the meantime, unbeknownst to USAID and EAEF's finance staff, Harmon told HC Securities to expedite liquidating a significant portion of the Caravel Fund's Egyptian T-Bills. This allowed Harmon and his family to redeem their investments in the Caravel Fund by October 2022.

14. Because HC Securities treated EAEF and the Caravel Fund like they were the same

customer, James Harmon's direction to expedite the liquidation of Caravel's Egyptian T-Bills came at the expense of EAEF's ability to do so. As a result, EAEF was stuck with its Egyptian T-Bill holdings even as the value of the Egyptian pound repeatedly dropped after August 2022— by March 2024, it had declined 60% from 19 Egyptian pounds per U.S. dollar to 49 Egyptian pounds per U.S. dollar. This has caused EAEF to sustain millions of dollars in losses and hampered EAEF's ability to make additional investments in Egypt after 2022. In other words, James Harmon's knowing and improper efforts to expedite the liquidation of the Caravel Fund's Egyptian Treasury Bills at the expense of EAEF's earlier efforts to do so has reduced, by millions of dollars, the funds that EAEF has for fulfilling its obligation to repay the U.S. Treasury.

15. By treating EAEF funds as a private resource for the Harmon family, Defendants have enriched themselves at the direct expense of the public fisc. Under the FCA, they are liable to the Government for treble damages and civil penalties.

## II. JURISDICTION AND VENUE

16. This Court has jurisdiction over the subject matter of this action pursuant to: (i) 31 U.S.C. § 3732, which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730; (ii) 28 U.S.C. § 1331, which confers federal question jurisdiction; and (iii) 28 U.S.C. § 1345, because the United States is a Plaintiff.

17. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants reside or can be found in this District, because Defendants transact business in this District and because one or more acts taken by Defendants in violation of the FCA occurred in this District.

18. This action is not based upon prior public disclosures of allegations or transactions in a criminal, civil, or administrative hearing, lawsuit, or investigation, or in a Government Accountability Office or Auditor General's report, hearing, audit, or investigation, or from the

news media. To the extent there has been a public disclosure unknown to Relator, it is an original source under 31 U.S.C. § 3730(e)(4). The facts and information set forth herein are based upon Relator's information and investigation. Relator has direct and independent knowledge of the information on which the allegations are based, and it has voluntarily provided the information to the government before filing this *qui tam* action.

19. Venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because the acts and omissions giving rise to the allegations and claims asserted here substantially occurred in this District and because one or more Defendants reside in this District.

## III. PARTIES

20. Relator 537 Holdings LLC is a limited liability corporation organized under the laws of Delaware.

21. Defendant Caravel Management is a limited liability company with its principal office in Manhattan. Until April 2023, Caravel Management was an investment advisor registered with the SEC with the CRD number of 319163. During all relevant times, Caravel Management's main activities involved managing the Caravel Fund.

22. Defendant Caravel Partners is a limited liability company with its principal office in Manhattan at the same location as Caravel Management. During all relevant times, Caravel Partners is the managing member of Caravel Management.

23. Defendant Caravel Fund is a limited partnership registered in Delaware. During all relevant times, Caravel Fund's principal office was in the same location in Manhattan as Caravel Management.

24. Defendant James A. Harmon has, during all relevant times, served as the Chairman of EAEF as well as the managing member and co-owner of Caravel Management, the managing

member of the Caravel Fund, and a member of Caravel Partner. James Harmon also has operated other non-EAEF businesses, including Harmon & Co. and the Harmon Family Foundation.

25. Non-party Deborah L. Harmon is James Harmon's daughter, a co-owner of Caravel Management, and Artemis's chief executive officer.

26. Non-party Artemis Real Estate Partners, LLC is an investment advisor that has its principal office in Chevy Chase, Maryland, and a local office in Manhattan. During all relevant times, Deborah Harmon has been the chief executive officer of Artemis.

27. Non-party Margaret Engelhardt has, during all relevant times, served as the chief administrative officer and chief compliance officer for Caravel Management and the Vice President for Administration at Harmon & Co. Engelhardt also personally held an investment in the Caravel Fund. Finally, since in or about 2020, Engelhardt has held the title of chief of staff at EAEF.

28. Non-party Fiona Mora has, during all relevant times, worked for James Harmon as his assistant at Caravel Management. Since in or about 2018, Mora also has held the title of executive assistant at EAEF.

## IV. STATUTORY AND CONTRACTUAL TERMS OF USAID'S GRANT TO EAEF

### A. <u>Congress Authorized USAID Funding to EAEF to Further Federal Interests</u>

29. As part of the Consolidated Appropriations Act of 2012, Congress authorized the U.S. Department of State to provide funds "to establish and operate [an] enterprise fund[] for Egypt." *See* Pub. L. 112-74, § 7041(b). In granting this funding authority, Congress specified that any enterprise fund for Egypt must comply with "provisions contained in section 201 of the Support for East European Democracy (SEED) Act of 1989," other than "subsections (b), (c), (d)(3), and (f)." *Id.*

30. Section 201(e) of the SEED Act authorized the USAID to make grants to enterprise

funds on behalf of the Government. *See* 22 U.S.C. § 5421(e). Section 201 of the SEED Act further defines the two legislative purposes for the creation of enterprise funds like EAEF—namely, "(1) development of the [] private sectors [in a host country], including small businesses, the agricultural sector, and joint ventures with United States and host country participants, and (2) policies and practices conducive to private sector development in [the host country]." *Id.* § 5421(e).

**B. <u>Terms of the USAID Grant to EAEF Required James Harmon to Fully Disclose All Conflicts of Interest and to Seek USAID Approval</u>**

31. By incorporating section 201 of the SEED Act into the funding authorization for the EAEF, Congress made it clear that USAID grant funds cannot be used for the private benefit of EAEF's board members, officers, and employees. *See* 22 U.S.C. § 5421(l) ("No part of the funds [granted to an] Enterprise Fund shall inure to the benefit of any board member, officer, or employee of such Enterprise Fund, except as salary or reasonable compensation for services.").

32. The terms of the USAID grant to EAEF, in turn, established clear requirements relating to conflicts of interest. As a starting point, USAID's grant agreement with EAEF specifies that the SEED Act's prohibition against private benefit applies. *See* Program Description Egyptian-American Enterprise Fund at 17 (attached as <u>Exhibit 1</u>).

33. The USAID grant agreement defines "Direct Conflict" to include any situation "where any director or officer of [EAEF] (or any spouse or child of any director or officer) is a partner, director, trustee, member, officer or employee, or has a direct financial interest in, any other corporation, partnership, [] or other organization with which [EAEF] is considering entering into any contract [] or other transaction." *Id.*

34. In other words, and as relevant here, a direct conflict exists under the terms of the USAID grant agreement if a contemplated transaction involves EAEF, on one hand, and an entity like Caravel Management, on the other hand because an EAEF director or officer—namely, James

Harmon—is a member of Caravel Management and holds a direct financial interest in Caravel as a co-owner. A direct conflict also exists in any contemplated transaction involving EAEF and Artemis because Deborah Harmon—the child of an EAEF director or officer—is both an officer of Artemis and holds a direct financial interest in Artemis.

35. Finally, for "any proposed transaction of [EAEF] that involves [] a Direct Conflict," the USAID grant agreement requires "the conflicted director or officer" to "disclose in writing … all material facts as to his or her relationship or interest" and to seek approval from USAID. *See* Ex. 1 at 17.

### C. **<u>Terms of the USAID Grant Imposes an Obligation on EAEF to Return 50% of Its Investment Proceeds to the U.S. Treasury</u>**

36. Pursuant to the USAID grant agreement, EAEF is not intended to operate indefinitely; instead, the agreement specifies that "USAID shall establish the date [] after which [EAEF] shall not make any new commitments or investment and by which [EAEF] shall commence the windup of its affairs and sale of its assets on an orderly basis." Ex. 1 at 19. Initially, USAID established December 31, 2022, as the windup date. USAID has since redesignated December 31, 2028, as the windup date for EAEF.

37. The windup provision of the grant agreement also requires EAEF to propose "a winding up and liquidation plan" to USAID and to implement a plan for windup and liquidation determined by USAID. *See id*.

38. Finally, the USAID grant agreement spells out how the proceeds from the liquidation of EAEF's investments will be disposed. Specifically, "50%[] of the proceeds realized by [EAEF] from the liquidation of its assets should be returned to the U.S. Treasury." *Id*. at 20. Put simply, EAEF has an obligation to pay at least half of its investment proceeds to the Government.

## V. THE FCA

39. The FCA, also known as "Lincoln's Law," was originally enacted during the Civil War to combat endemic fraud in federal procurement. Congress substantially amended the FCA in 1986—and further amended the statute in 2009 and 2010—to enhance the ability of the United States to recover losses sustained as a result of fraud against it. Congress amended the FCA after finding that fraud affecting federal programs was pervasive and that the FCA—which Congress characterized as the primary tool for combating government fraud—was in need of modernization and updates. Congress intended for the amendments to the FCA to create incentives for individuals with knowledge of fraud affecting federal programs to disclose the information without fear of reprisals or government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on behalf of the Government.

40. As amended, the FCA imposes civil liability on any person who, *inter alia*: (i) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;" (ii) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;" or (iii) "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. §§ 3729(a)(l)(A), (B), (G).

41. The FCA defines a "claim" to include "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property that—(i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the behalf of the United States or to advance a federal program or interest, and if the United States—(I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or

property which is requested or demanded[.]" 31 U.S.C. § 3729(b)(2). This includes claims for USAID grant funds, including when made to entities like EAEF receiving grants from USAID to further programs or interests established by the Government.

42. The FCA defines the terms "knowing" and "knowingly" to mean "that a person, with respect to information—(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). The FCA does not require proof of specific intent to defraud. 31 U.S.C. § 3729(b)(l)(B).

43. For purposes of section 3729(a)(1)(B), the FCA defines "material" to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

44. The FCA also defines "obligation" in section 3729(a)(1)(G) – the reverse false claims provision – to include any "established duty, whether or not fixed, arising from an express or implied contractual … relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of an overpayment." *Id.* § 3729(b)(3). This broad definition reflects Congress's intent for the reverse false claims provision of the FCA to apply to non-fixed duties to pay or repay the Government. *See* S. Rep. 111-10 at 14 (2009). As relevant here, EAEF's established duty under its grant agreement to return investment proceeds to USAID after December 2028 is an "obligation" for purposes of the FCA.

45. The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States and to share in any recovery. The FCA requires the complaint to be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the Government time to conduct its own investigation and to determine whether to join

the suit. 31 U.S.C. § 3729(b)(2). The Government may move the court for extensions of the seal. 31 U.S.C. § 3729(b)(3).

46. Finally, any person who violates the FCA is liable for treble damages sustained by the Government as well as a mandatory civil penalty for each claim. *See* 31 U.S.C. § 3729(a)(l).

## VI. DEFENDANTS VIOLATED THE FCA BY FALSELY AND IMPROPERLY CAUSING EAEF TO PAY THE SALARIES OF CARAVEL MANAGEMENT EMPLOYEES

### A. James Harmon Has Employed Margaret Engelhardt and Fiona Mora to Work Primarily on His Caravel Business and Personal Activities Instead of EAEF Matters

47. During all relevant times, Margaret Engelhardt and Fiona Mora have primarily worked for James Harmon on his activities outside of EAEF, including on Caravel Management and the Caravel Fund businesses and Harmon's personal activities.

48. Specifically, Engelhardt has served as the chief administrative officer and chief compliance officer for Caravel Management. *See* Exhibit 2 (2023 ADV Form for Caravel Management). In that role, Engelhardt has handled Caravel Management's and the Caravel Fund's administrative and financial activities, including, *inter alia*, compliance reporting, contribution and redemption requests, investor relations, NAV financial reporting, office lease, regulatory audits, and tax reporting and withholding. In addition, James Harmon also had Engelhardt work on his other outside businesses, including for Harmon & Co. and the Harmon Family Foundation. Finally, Harmon had Engelhardt assist him and his family with personal affairs, including to arrange for home maintenance and improvement and to oversee sales of pieces from their art collection.

49. Due to her varied responsibilities for Caravel Management, the Caravel Fund, and James Harmon's other outside businesses, and the Harmon family's personal activities, Engelhardt regularly told EAEF staff that she did not have time to work on EAEF matters. Engelhardt also frequently asked EAEF staff to assist her with Caravel business, including tax withholding, accounting, and investor relation matters.

50. Further, although James Harmon gave Engelhardt the nominal title of Chief of Staff at EAEF in 2020, Engelhardt has never sought or used an EAEF email account (with the domain name @eaefund.org). Instead, she always used a Caravel Fund-assigned email account (with the domain name @caravelfund.com) for work.

51. Similarly, Fiona Mora has been James Harmon's executive assistant at Caravel Management since in or about 2008. In that role, and as with Engelhardt, Mora has worked almost exclusively on James Harmon's outside businesses or personal activities, including to arrange for the scheduling and logistics of Caravel events and to take care of housekeeping issues at the Harmon family's residences. By contrast, Mora devoted minimal time to EAEF matters.

52. Further, even though James Harmon in 2018 gave Mora the nominal title of an executive assistant at EAEF, Mora, like Engelhardt, has never sought or used an EAEF email account. Instead, she has always used a Caravel Fund-assigned work email account.

**B. James Harmon Improperly Caused EAEF to Pay Engelhardt's and Mora's Salaries and Benefits Since 2018**

53. Starting in 2018, James Harmon recognized that he could saddle EAEF with paying the salaries and benefits for Engelhardt and Mora while they continued to work principally on Harmon's Caravel businesses and his other non-EAEF activities.

54. James Harmon began by only allocating a portion of Engelhardt's and Mora's salaries, benefits, and payroll taxes to EAEF.[1] In 2018 and 2019, for example, Harmon caused EAEF to pay $43,121 and $46,805 in base salary to Mora in addition to $5,000 and $20,000 in bonuses plus other benefits.

---

[1] In conversations with EAEF staff, Engelhardt stated, in substance, that she did not make more money overall, but James Harmon was changing the allocation, *i.e.*, having EAEF, instead of Caravel, pay her salary. In other words, James Harmon shifted more and more of the salaries and benefits for her and for Mora from Caravel to EAEF because Caravel Management's advisory fee income started to decline.

55. For 2020, James Harmon caused EAEF to pay $97,726 in base salary to Engelhardt and $82,429 in base salary to Mora. According to a memorandum in EAEF's files dated December 23, 2019, Harmon personally made the decision to "increase[] the split between Caravel and EAEF" vis-à-vis Mora's salary. In addition to their salaries, Harmon also caused EAEF to pay $40,000 in bonus to Engelhardt in 2020 and $20,000 in bonus to Mora plus other benefits (attached as Exhibit 3 is a table summarizing the total salaries and benefits that Defendants falsely and improperly caused EAEF to pay).

56. For 2021, James Harmon decided to make EAEF pay an even larger share of Engelhardt's and Mora's salaries even though both worked primarily for Harmon on his Caravel and personal business. Specifically, Harmon caused EAEF to increase Engelhardt's base salary to $111,589 and Mora's base salary to $89,859.

57. To deflect attention, Harmon had Engelhardt create a false record in EAEF's files. Instead of reporting the base salary increases for Engelhardt and Mora between 2020 and 2021, Harmon had Engelhardt falsely state in a memorandum dated December 21, 2020, that there was "no change" to either Engelhardt's or Mora's salary.

58. In 2022, 2023, and 2024, James Harmon decided to saddle EAEF with even higher compensation for Engelhardt and Mora. Specifically, he caused EAEF to increase Engelhardt's base salary to $147,000 in 2023 and $179,760 in 2024 and to increase Mora's base salary to $130,000 in 2022, $138,000 in 2023, and $151,800 in 2024. Harmon also caused EAEF to give Engelhardt and Mora substantial bonuses each year plus other benefits even though both devoted minimal time to EAEF matters and worked primarily on Harmon's Caravel and personal business.

59. James Harmon knew that it was a direct conflict of interest for him to make EAEF

pay the salaries and bonuses of Caravel employees like Engelhardt and Mora. Further, as evidenced by his decision in December 2020 to falsify EAEF's records, Harmon knew it was improper for him to saddle EAEF with larger and larger shares of Caravel's costs.

60. In 2024, James Harmon went a step further and caused EAEF to pay himself an annual salary of $100,000 starting in April 2024. This was another direct conflict of interest that required disclosure and approval under the terms of the USAID grant to EAEF. Harmon, however, never made the required disclosure or sought the necessary approval in advance.

61. As a result of these violations of material requirements of the USAID grant to EAEF, Harmon and the other Defendants violated the FCA by causing false claims to be submitted for payment from federal funds and causing the use of false records and statements in connection with such claims.

## VII. Defendants Violated the FCA by Falsely and Improperly Causing EAEF to Subsidize Caravel's and Artemis's Office Rental and Utility Costs

62. Between in or about 2013 and August 2022, EAEF subleased its office space from Caravel Management on the 16th floor of 888 Seventh Avenue. EAEF initially paid $2,000 to Caravel each month in rent. James Harmon, however, repeatedly raised the rent such that, by 2022, EAEF was paying $12,000 in rent per month to Caravel even though most of the space on the 16th floor was being used by Caravel and Artemis, Deborah Harmon's firm.[2]

63. In September 2022, James Harmon caused EAEF to move its office from the 16th floor to the 30th floor at 888 Seventh Avenue. James Harmon made this move so EAEF could A) subsidize Artemis, his daughter Deborah Harmon's firm, by overpaying to sublease a section of the 30th floor from Artemis, and b) subsidize Caravel Management, James Harmon's outside

---

[2] As is the case with James Harmon's decision to saddle EAEF with paying Engelhardt and Mora, James Harmon has shifted more and more of the office rental cost from Caravel to EAEF when Caravel Management's advisory fee income declined.

business, by subleasing space on the 30th floor to Caravel at a discounted rate.

64. Specifically, James Harmon caused EAEF to sign a 3-year sublease with Artemis under which EAEF agreed to pay Artemis at least $22,000 per month in rent ( Attached as Exhibit 4 is a copy of the executed sublease between Artemis and EAEF dated August 31, 2022).

65. Notwithstanding that significant monthly payment, James Harmon allowed Deborah Harmon and Artemis to use two office cubicles within EAEF's space for free. James Harmon also made EAEF sublease space to Caravel Management for $7,000 per month even though Caravel and Artemis used approximately half of EAEF's office space on the 30th floor. *See* Aug. 19, 2022, memorandum from M. Engelhardt to J. Harmon and H. El-Nazer (attached as Exhibit 5).[3]

66. Further, while Caravel Management, Artemis, and EAEF shared the use of the office space subleased to EAEF on the 30th floor, James Harmon made EAEF pay 100% of the office utility costs. When questioned about this split in July 2023, Margaret Engelhardt stated emphatically that Caravel did not need to pay those costs to EAEF.

67. Having EAEF subsidize the office costs of Caravel Management, for which James Harmon is a member and a co-owner, and Artemis, for which Deborah Harmon is an officer, was a direct conflict of interest under the terms of USAID's grant to EAEF. Harmon, therefore, was required to fully disclose those conflicts to both the Board of EAEF and USAID and to seek the required approvals. Harmon, however, failed to comply with either requirement.

68. In 2024, Deborah Harmon asked James Harmon to agree to early termination of the 3-year sublease between EAEF and Artemis because Artemis needed more space on the 30th floor

[3] James Harmon also caused EAEF to agree to a term in this sublease that allowed Caravel Management to cancel its obligation after just one year.

of 888 Seventh Avenue. Instead of acting in EAEF's best interest and seeking compensation from Artemis, James Harmon agreed to the early termination without any compensation to EAEF.

69. By agreeing to this early termination with his daughter's business, Artemis, Harmon engaged in a conflicted transaction under the terms of USAID's grant. Harmon, therefore, was required to fully disclose those conflicts to both the EAEF Board and USAID and to seek the required approvals. Harmon, however, failed to comply with either requirement.

70. As a result of the early termination of EAEF's sublease from Artemis, James Harmon made EAEF enter into a new—and significantly more expensive at $32,870 a month—lease for office space on the 15th floor of 888 Seventh Avenue starting in October 2024.

71. James Harmon also caused EAEF to stop requiring Caravel Management to pay to sublease space from EAEF. In other words, even though Caravel Management has continued to use a significant portion of EAEF's office space, it has been doing so for free.

72. Having EAEF subsidize the office costs of Caravel Management is a conflicted transaction under the terms of USAID's grant. James Harmon, therefore, was required to fully disclose the conflict to both the EAEF Board and USAID and to seek the required approvals. Harmon, however, failed to comply with either requirement.

73. In sum, James Harmon also has knowingly and repeatedly benefited by misusing EAEF funds relating to office leases. As a result, Harmon and the other Defendants violated the FCA by causing false claims to be submitted for payment from federal funds.

## VIII. DEFENDANTS VIOLATED THE FCA BY IMPROPERLY EXPEDITING THE LIQUIDATION OF CARAVEL FUND'S EGYPTIAN T-BILL HOLDINGS AT THE EXPENSE OF EAEF

74. In 2018, EAEF received approximately $46 million in proceeds in Egypt when a local firm in which EAEF invested had a successful initial public offering. EAEF then obtained special approval from USAID to invest those proceeds in Egyptian T-Bills as part of a cash

management strategy to earn higher interest. It was understood by both EAEF and USAID that holding Egyptian T-Bills was a near-term solution until EAEF could make investments in Egypt using the proceeds in line with its statutory mandate.

75. Starting in July 2019, EAEF began buying Egyptian T-Bills consistent with this cash management strategy. Over the next three years, as EAEF obtained additional proceeds from exiting investments, it increased its Egyptian T-Bill holdings. For those purchases, EAEF initially used the Commercial International Bank of Egypt ("CIB") as the broker of its Egyptian T-Bills.

76. Starting in January 2021, however, James Harmon had EAEF transfer its Egyptian T-Bill holdings from CIB to HC Securities, which Harmon was already using for his Caravel Fund. After this transfer, HC Securities treated EAEF's account and the Caravel Fund's account as if they belonged to a single customer—James Harmon. On information and belief, in return for Harmon's role in making EAEF move its Egyptian T-Bill holdings from CIB to HC Securities, HC Securities agreed to keep its management fees for the Caravel Fund's account at HC Securities at the same level rather than raising its fees.

77. By December 2021, EAEF's entire holding of Egyptian T-Bills—valued at $121 million at the then-current exchange rate—was held at HC Securities. As that amount grew, board members and finance staff at EAEF began voicing concerns about the foreign exchange rate risk associated with this holding. Specifically, they recognized that a significant devaluation of the Egyptian Pound not only could cause a loss to EAEF, but also could negatively affect EAEF's ability to honor its outstanding funding commitments for investments that were in-line with EAEF's statutory mandate.

78. In March 2022, Egypt chose to devalue its currency by approximately 15%—from 15.7 Egyptian pound per U.S. dollar to 18.4 per dollar. This devaluation prompted EAEF to

reconsider its investment in Egyptian T-Bills.

79. In July 2022, EAEF staff traveled to Egypt to meet with the fund's local partners and other contacts. Based on local market intelligence collected by EAEF's staff in Egypt, EAEF decided to start liquidating its Egyptian T-Bill holdings. Specifically, at EAEF's direction, HC Securities sold approximately half of EAEF's Egyptian T-Bills between July 30 and August 2, 2022, and converted the proceeds to U.S. dollars.

80. On August 3, 2022, EAEF instructed HC Securities to sell the remainder of EAEF's Egyptian T-Bill holdings—worth approximately $58 million at the prevailing exchange rate of approximately 19 Egyptian pounds per U.S. dollar.

81. This time, however, HC Securities did not execute this sale request promptly or fully. Instead, between August 3 and August 15, EAEF received a series of conflicting and inconsistent responses from HC Securities about the status of this sale request.

82. During this period, the Caravel Fund also held tens of millions of dollars of Egyptian T-Bills in its account at HC Securities. As of early August 2022, James Harmon was reassuring Caravel Fund investors that Egypt's impending currency crisis would soon be resolved by a loan from the International Monetary Fund ("IMF").

83. By mid-August 2022, after EAEF staff alerted him to the market conditions in Egypt and the difficulties that EAEF was encountering with liquidating Egyptian T-Bills and repatriating the proceeds, James Harmon realized the severity of Egypt's currency crisis and the need for the Caravel Fund—in which he and his children were major investors —to liquidate its Egyptian T-Bill holdings as quickly as possible. Harmon also knew that because HC Securities treated EAEF's and the Caravel Fund's accounts at HC as if they belonged to a single customer, he could expedite the liquidation of Caravel Fund's Egyptian T-Bill holding if he told HC

Securities to delay action on EAEF's request for liquidation.

84. Accordingly, on August 16, 2022, James Harmon advised HC Securities that EAEF's liquidation request was not urgent. Specifically, Harmon wrote in an email to Wael Wagih, EAEF's broker at HC Securities, that "I do not expect much to be accomplished on this matter" until "a new IMF agreement [is] announced by mid October [2022]." Harmon proceeded to take control of both EAEF's and Caravel's efforts to liquidate their Egyptian T-Bill holdings.

85. Due to Harmon's direction to HC Securities, EAEF's August 3rd request to sell the remainder of its Egyptian T-Bill holdings was only partially executed in 2022. In the meantime, the Egyptian pound began losing value as the Egyptian government's lack of foreign reserve made it nearly impossible to exchange Egyptian pounds for U.S. dollars.[4] Further, while HC Securities executed some sales for EAEF between September 8 and October 4, 2022, EAEF was only able to liquidate a third of its remaining Egyptian T-Bill holdings for approximately $16.3 million.

86. On information and belief, James Harmon told HC Securities to move forward with liquidating the Caravel Fund's Egyptian T-Bill holding between late August and early October 2022. By mid-October 2022, the Caravel Fund was able to sell a significant portion of its Egyptian T-Bills, which allowed the Harmon family to redeem their investments in the Caravel Fund.

87. By contrast, due to the delay caused by James Harmon, EAEF was not able to liquidate its Egyptian T-Bill holding in 2022 and, instead, saw the value of its holding decline substantially as a result of devaluations of the Egyptian pound. As of early March 2024, EAEF still held Egyptian T-Bills valued at approximately one billion Egyptian pounds. The dollar value of that holding, however, had declined by approximately $20 million between September 2022

[4] By January 2023, the exchange rate had deteriorated to 30.8 Egyptian pounds per U.S. dollar (vs. 19 Egyptian pounds per U.S. dollar in August 2022). Over the next year and half, the exchange rate further deteriorated to approximately 49 Egyptian pounds per U.S. dollar as of early March 2024.

and early March 2024, when the Egyptian banking sector gained access to foreign currency.

88. James Harmon knew that it was a direct conflict of interest for him to direct HC Securities to prioritize the liquidation of the Caravel Fund's Egyptian T-Bill holding at the expense of EAEF. For example, in mid-September 2022, Harmon acknowledged to Margaret Engelhardt in an email exchange that EAEF's liquidation request would be resolved first by HC Securities before other requests.

89. Nonetheless, James Harmon knowingly and improperly directed HC Securities on August 16, 2022, to pause its effort to liquidate EAEF's Egyptian T-Bill holding while he asked HC to expedite the sale of the Caravel Fund's Egyptian T-Bills.

90. As a result of this conduct, James Harmon and the other defendants knowingly and improperly decreased the amount of assets that EAEF will be able to return to the U.S. Treasury under the terms of the USAID grant to EAEF.

## COUNT I

### Presentation of False or Fraudulent Claims
### 31 U.S.C. § 3729(a)(1)(A)

91. The allegations contained in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

92. Through the acts and omissions described above, Defendants knowingly presented or caused to be presented false or fraudulent claims to EAEF for payment or approval within the meaning of 31 U.S.C. § 3729(a)(1)(A).

93. Specifically, on account of Defendants' fraudulent conduct, they knowingly submitted, or caused to be submitted, claims for payments of salaries, benefits, and office rental costs from EAEF that were false and material to payment decisions by EAEF.

94. By reason of the false claims that Defendants knowingly presented, or caused to be

presented, for payment or approval, the Government has been damaged in a substantial amount to be determined at trial, and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

**COUNT II**

**MAKING AND USING FALSE STATEMENTS IN VIOLATION OF THE FCA**
**31 U.S.C. § 3729(a)(1)(B)**

95. The allegations alleged in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

96. Through the acts and omissions described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim, within the meaning of 31 U.S.C. § 3729(a)(1)(B).

97. Specifically, on account of Defendants' fraudulent conduct, they knowingly made, or caused to be made, false records or statements—including false statements concerning the salaries of Caravel employees like Margaret Engelhardt and Fiona Mora—material to false or fraudulent claims submitted to EAEF.

98. By reason of the false claims that Defendants knowingly presented, or caused to be presented, for payment or approval, the Government has been damaged in a substantial amount to be determined at trial and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## COUNT III

### Reverse False Claims — Knowingly and Improperly Avoiding an Obligation to Repay the Government 31 U.S.C. § 3729(A)(1)(G)

99. The allegations alleged in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

100. Through the acts and omissions described above, and within the meaning of 31 U.S.C. § 3729(a)(1)(G), Defendants knowingly and improperly avoided an obligation to repay the Government.

101. Specifically, on account of Defendants' knowing and improper directions to HC Securities between August and October 2022, HC Securities delayed its effort to liquidate EAEF's Egyptian T-Bill holding and expedited the liquidation of the Caravel Fund's Egyptian T-Bill holding, which reduced the amount of funds available to EAEF to fulfill its obligation to return funds to the U.S. Treasury pursuant to the terms of USAID's grant to EAEF.

102. By reason of Defendants' knowing and improper conduct, the Government has been damaged in a substantial amount to be determined at trial and is entitled to recover treble damages plus a civil monetary penalty for each false record or statement.

## DEMAND FOR RELIEF

WHEREFORE, Relator seeks entry of judgment against Defendants, jointly and severally, as follows:

a. ordering Defendants to cease and desist from violating the FCA;

b. entering judgment against Defendants in an amount equal to three times the amount of damages that the Government has sustained because of Defendants' actions, plus the maximum civil penalties provided for each violation of the FCA;

c. awarding Relator a full share of the proceeds of this action or settlement in accordance with 31 U.S.C. § 3730(d);

d. awarding Relator all costs of this action, including his attorneys' fees and expenses, pursuant to 31 U.S.C. §3730(d);

e. awarding the Government their costs and all other relief authorized by law; and

f. ordering such other and further relief as the Court deems proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a jury trial.

Dated: January 3, 2025

| **DICELLO LEVITT LLP** | **BIANCA BEAM LAW** |
| --- | --- |
| By:__________<br>Li Yu<br>485 Lexington Avenue, Suite 1001<br>New York, NY 10017<br>(646) 933-1000 x535<br>Lyu@DicelloLevitt.com | By: /s/__________<br>Biance Beam<br>1 N. 4th Place<br>Brooklyn, NY 11249<br>Bbeam@biancabeamlaw.com |