Attachment 1

# PROGRAM DESCRIPTION
# EGYPTIAN-AMERICAN ENTERPRISE FUND

## A. PURPOSE

As provided in the Act, the purpose of the Fund is, through loans, microloans, equity investments, insurance, guarantees, grants, feasibility studies, technical assistance, training for businesses receiving investment capital, and other measures, to promote: (i) development of the Egyptian private sector, including small businesses, the agricultural sector, and joint ventures with United States and Egypt participants; and (ii) policies and practices conducive to private sector development in Egypt. In particular, the Fund will seek to encourage the creation and expansion of small and medium-sized enterprises in Egypt. The Fund will seek to accomplish its purpose through transactions which are intended to assist in the initiation and expansion of a wide array of private enterprises, promote and disseminate international business know-how and best practices and demonstrate to other potential investors that private sector investment can be undertaken profitably in Egypt. In addition, it is anticipated that the Fund, through its operations, will help identify and promote policies and practices which are needed to encourage and facilitate private investment. The Fund will seek to develop an investment portfolio which, over the long term, will make the Fund self-sustaining.

## B. ESTABLISHMENT AND DESIGNATION OF THE FUND

The Fund has been established and designated in accordance with the Act.

The Fund has been established in the U.S. as a not-for-profit corporation which does not have shareholders and will not distribute dividends. The Fund will use the revenues generated by the Fund to pay Fund expenses (Fund expenses may also be paid out of funds provided under this Grant Agreement to the extent consistent with Section E.7 of the Program Description, entitled "Administrative Expenses") and for reinvestment in new investments, projects and activities in Egypt. The Board of Directors and executive management of the Fund shall, in their sole discretion, determine how the Fund is structured and make strategic and operating decisions, subject to the provisions of this Grant Agreement and the Fund's organizational documents.

## C. DESCRIPTION OF FUND ACTIVITIES

The Fund may engage in the following activities:

1. Transactions

The primary activity of the Fund will be to engage in a variety of private sector transactions in Egypt, consistent with the Fund's investment policies and objectives. The exact nature of these

transactions will be determined by the Board of Directors and executive management of the Fund. It is anticipated that the Fund will make both equity investments and loans, and seek to develop financial transactions and instruments which are appropriate to the existing circumstances of the Egyptian economy. Fund management will seek to develop appropriate exit strategies, where possible, for its investment portfolio.

2. Technical Assistance

The Fund may undertake or finance technical assistance activities that directly support investments and potential investments, without the prior approval of USAID, provided that the Fund reports on such technical assistance to USAID pursuant to a results framework and monitoring and evaluation schedule and metrics agreed to by USAID. The Fund may pay technical assistance costs from a separate account or identifiable source of funds, or from the Fund's investment capital.

The Fund will not undertake any *other* technical assistance activities without the prior approval of USAID, which approval shall be deemed to have been granted unless USAID objects within thirty (30) days after having received notice of a request for approval accompanied by reasonable detail regarding the proposed technical assistance activity. USAID will provide the Fund guidance on the manner in which it should consult with, and obtain approval from, USAID for other technical assistance activities.

## D. INVESTMENT POLICIES

The Fund will follow the investment policies set forth in this section. The application of the policies to individual investment decisions will be based on the business judgment of the Fund's Board of Directors and executive management. As used herein and elsewhere in the Grant Agreement, the term "investment" means direct equity investments, loans and other forms of financial commitment (including, without limitation, investments in financial institutions, private equity funds, private equity co-investment vehicles and/or separate accounts that delegate the discretion to make underlying investments to investment managers), unless the context requires otherwise.

1. Target Group

The Fund will target its investment program on small and medium size enterprises in Egypt.

2. Egyptian Participation

To the extent practicable under the circumstances, the Fund will seek to encourage Egyptian private sector participation in the ownership and management of the entities in which the Fund (or its underlying investments) invests.

3. Principles for Environmental Management

The Fund has adopted Principles for Environmental Management as part of its Statement of Corporate Policies and Procedures approved by USAID. The Fund shall implement such

Principles for Environmental Management in the course of its operations, including when making any investments.

## E. OPERATIONAL REQUIREMENTS

### 1. Changes in Structure

The Fund will not establish, invest in or finance any newly-created subsidiary, affiliate or other entity which has any of the same directors, managers, officers or employees as the Fund without the prior written approval of USAID (which approval shall be deemed to have been granted unless USAID objects within thirty (30) days after having received notice of a request for approval accompanied by reasonable detail regarding the nature of the proposed entity, provided that, if the Fund notifies USAID that a shorter approval period is required in particular circumstances, then USAID shall endeavor diligently and in good faith to provide a response within the requested approval period). For the avoidance of doubt, this restriction is not intended to, and does not, apply to a Parallel Fund or SPV (each, as defined below) or to the Fund's portfolio companies, or to restrict directors of the Fund from serving as directors of investee portfolio companies.

### 2. Parallel Funds

For purposes of this Grant Agreement: (i) the term "Parallel Fund" means an entity that (1) does not receive capital from funds provided by USAID; (2) may have the same management as the Fund (including, without limitation, the same board of directors and/or officers); and (3) co-invests with the Fund in each underlying investment of the Fund pro rata based upon each entity's investable funds; and (ii) the term "SPV" means a special purpose vehicle created by the Fund for a single investment which is either wholly-owned by the Fund or jointly owned by the Fund and any Parallel Fund(s) based upon each entity's share of the underlying investment.

It is understood and agreed that the Board of Directors of the Fund will look for opportunities to leverage the investment mission of the Fund by seeking to raise third party capital (including from sovereign wealth funds and other non-U.S. capital sources) to co-invest alongside the Fund. With respect to any Parallel Fund, the approval of USAID shall be required solely as to (i) the identities of the investors in such Parallel Fund, and (ii) if the Fund and such Parallel Fund will co-invest other than on a pro rata basis, the framework for the terms on which the Fund and such Parallel Fund will co-invest. The approval referenced in the preceding sentences shall be deemed to have been granted unless USAID objects within thirty (30) days after having received notice of the matter requiring USAID approval, provided that, if the Fund notifies USAID that a shorter approval period is required in particular circumstances, then USAID shall endeavor diligently and in good faith to provide a response within the requested approval period.

For the avoidance of doubt, if either the Fund or a Parallel Fund, independent of the other, makes investments that are otherwise not suitable for the other due to particular investment restrictions applicable to such entity (e.g., in the case of the Fund, due to restrictions set forth in the Act and this Grant Agreement) the approval requirements of this Section E.2. shall not apply to such investments. With respect to any investment by the Fund with a Parallel Fund in an SPV, or by an SPV wholly-owned by the Fund with a Parallel Fund, the approval of USAID shall be required solely as to (i) the identities of the investors in such Parallel Fund, and (ii) if the Fund or wholly-owned SPV and such Parallel Fund will co-invest other than on a pro rata basis, the framework for the terms on which the Fund and such Parallel Fund will co-invest. The approval referenced in the preceding sentences shall be deemed to have been granted unless USAID objects within thirty (30) days after having received notice of the matter requiring USAID approval, provided that, if the Fund notifies USAID that a shorter approval period is required in particular circumstances, then USAID shall endeavor diligently and in good faith to provide a response within the requested approval period.

For the avoidance of doubt, the formation of any other vehicle that raises third party capital and receives capital from funds provided by USAID (other than SPVs and portfolio companies in which the Fund makes investments), would require USAID approval. The approval referenced in the preceding sentence shall be deemed to have been granted unless USAID objects within thirty (30) days after having received notice of such vehicle, provided that, if the Fund notifies USAID that a shorter approval period is required in particular circumstances, then USAID shall endeavor diligently and in good faith to provide a response within the requested approval period.

It is understood and agreed that a Parallel Fund may compensate management (including through incentive compensation and bonus arrangements customary for private equity funds) and participate in the overhead expenses of administering the Fund's investment program.

3. Investment and Financial Services Entities

The Fund may establish, invest in or finance subsidiaries or other entities whose primary business is to make investments or loans or to provide financial services (including, without limitation, investing in financial institutions, private equity funds, private equity co-investment vehicles or separate accounts that delegate the discretion to make underlying investments to investment managers).

4. Matters to be Taken Into Account

In making investments and otherwise carrying out the activities contemplated by this Grant Agreement, the Fund shall take into account such considerations as internationally recognized worker rights and other internationally recognized human rights, gender, environmental factors, United States economic and employment effects, and the likelihood of commercial viability of the activity receiving assistance from the Fund. In its Investment Procedures (as defined in

Section 1 of the General Provisions), the Fund shall establish investment selection and diligence procedures reasonably designed to further such ends.

5. Privatization Transactions

The Fund may invest in state-owned enterprises provided such investment is made in an entity which is more than fifty percent owned by private sector parties (including the Fund), or is made in connection with a transaction which will result in more than fifty percent of the ownership of an entity being held by private sector parties.

6. Compensation Policies

As used herein and elsewhere in the Grant Agreement: (i) the term "bonus compensation" means compensation that may be paid to officers and employees of the Fund that is based on the Fund's evaluation of their performance measured against a variety of factors relevant to such person's responsibilities (which may, for later years, include among other factors a component related to the investment performance of the Fund); and (ii) the term "incentive compensation" means compensation paid to officers and employees of the Fund that is based on a formulaic percentage of the Fund's profits.

The salary and other compensation (including bonus compensation and incentive compensation) of any directors, officers and employees of the Fund shall be set at reasonable levels consistent with the non-profit and public interest nature of the Fund and other pertinent factors and in accordance with the Act. No part of the funds of the Grantee shall inure to the benefit of any board member, officer, or employee of the Grantee, except as salary or reasonable compensation (including bonus compensation and incentive compensation) for services. Subject to the foregoing, the Fund may enter into appropriate bonus compensation and/or incentive compensation arrangements with officers and employees of the Fund; provided that (i) the general framework for any bonus compensation and/or incentive compensation programs is approved in writing by USAID (for the avoidance of doubt, USAID approval will be as to the general framework only, and specific compensation arrangements with individual officers and employees of the Fund will not require the approval of USAID) and (ii) any incentive compensation is paid exclusively out of Program Income and not out of funds provided under this Grant Agreement (for the avoidance of doubt, this Section E.6.(ii) does not apply to bonus compensation).

7. Administrative Expenses

The Grantee acknowledges that the Act provides that not more than five percent of the funds made available pursuant to this Grant Agreement should be used for administrative expenses of the Grantee, and accordingly will use reasonable efforts to operate the Fund consistent with that goal. Notwithstanding the foregoing, it is acknowledged and agreed by USAID that the Grantee currently expects to use up to five percent per annum of the funds made available pursuant to this Grant Agreement for administrative expenses in the first three years of the Grantee's operations, and USAID has approved Grantee's preliminary budget attached as Annex 3 which provides for

expenses within such five percent per annum limit based on the understandings described further below.

The parties understand and agree that the budget set forth in Annex 3 is preliminary in nature and has been prepared based on estimates and preliminary assumptions made by the Fund prior to the commencement of operations; accordingly it is subject to changes that may be material after Fund operations have been initiated.

The preliminary budget is further based on the mutual understanding of the Grantee and USAID that the budget referenced above has been calculated based on projections of future additional tranches of grant funds that have been contemplated, provided, however, that the Grantee acknowledges that any such additional tranches of grant funds remain subject to the availability of funds.

For the avoidance of doubt, the "reasonable efforts" described in this paragraph will include in particular seeking to identify short and long term investments that seek to accomplish the purposes laid out in Section A of the Program Description and that may enable the contemplated future administrative expenses of the Fund to be paid for over time in whole or in part out of program income rather than grant funds.

No later than December 23, 2013 and annually thereafter until the Fund is dissolved, the Fund shall submit to the Committees on Appropriations of the United States Congress a report detailing the administrative expenses of the Fund.

## F. PERFORMANCE AND MONITORING

### 1. Goal Statement and Monitoring and Evaluation Plan

The Fund will define specific objectives in a "goal statement" to be included in its Annual Report (as defined in Section 12.A of the General Provisions) and consult with U.S. Government representatives during Semi-Annual Reviews (as defined in Section 12.B of the General Provisions) on progress towards its objectives. It is understood that it is unlikely that each investment or project undertaken by the Fund will be successful. The success of the Fund will be characterized by the extent to which the Fund causes or contributes to the attainment of the goals set forth in the Fund's objectives, as well as the sub-goals or intermediate results developed in accordance with Annex 1 hereto. The parties agree that the Fund and USAID will collaborate in good faith to further develop the attached Goal Statement and Monitoring and Evaluation Plan described in Annex 1 during the term of this Grant Agreement.

### 2. Monitoring

As part of USAID's ongoing oversight of the Grant activities, the Grantee agrees to provide information including, but not limited to, the following:

a. Rate of commitment and utilization of Grant funds;

b. Status of investment portfolio;

c. Use of technical assistance funds and extent of the recipient contributions to the costs of technical assistance provided;

d. Financial management systems and internal controls;

e. Administrative expenses;

f. Professional expenses incurred by the Fund;

g. Cash flow analysis including investment income reflows;

h. Salaries and related compensation for the employees of the Fund;

i. A Performance Monitoring Plan (PMP) as described in Annex 1 attached hereto; and

j. An evaluation schedule as agreed upon by the Fund and USAID.

## G. PRIVATE CHARACTER OF ENTERPRISE FUNDS

Nothing in this Grant Agreement shall be construed to make the Fund an agency or establishment of the United States Government, or to make the officers, employees or members of the Board of Directors of the Fund officers or employees of the United States for purposes of title 5, United States Code.

Attachment 2

## GENERAL PROVISIONS

### 1. ALLOWABLE COSTS

A. The Grantee may undertake activities under this Grant only for programs and projects which are consistent with the purposes set forth in the provisions of this Grant Agreement and the Act.

B. Funds provided hereunder may be used to support costs which are reasonable, allocable and allowable in accordance with the terms of this Grant Agreement and the Grantee's Statement of Corporate Policies and Procedures, which Statement of Corporate Policies and Procedures has been mutually agreed to by USAID and the Grantee. The Grantee shall submit any questions concerning cost items to the Agreement Officer for determination.

C. The Grantee has established as part of its Statement of Corporate Policies and Procedures, and shall maintain, investment selection, diligence and monitoring procedures ("Investment Procedures") that are designed to prevent the contribution of Grant monies and/or Program Income (as defined in Section 5 below) to: (1) any political parties or organizations which are not committed to respect for the democratic process; (2) the defense or security forces of any country; or (3) other prohibited transactions, as set forth in Section 10, below.

### 2. ACCOUNTING, AUDIT, AND RECORDS

A. Maintenance of Records. The Grantee shall maintain books, records, documents, and other evidence in accordance with U.S. generally accepted accounting principles to enable the Grantee to accurately determine Grant balances, book balances and reconciliation of book to Grant balances. The Grantee's financial management system shall separately account for each technical assistance activity funded by the Grant in a manner that identifies adequately the source and application of funds for all such activities. All available periodic financial statements and (if prepared) audits for all entities in which the Fund has directly invested or to which the Fund has directly loaned money (collectively, "Investees") shall also be maintained for audit review and project monitoring.

B. Access to Records. The Grantee shall preserve and make available such records for examination and audit by USAID and the Comptroller General of the United States, or their duly authorized representatives, until the Grantee is liquidated and its assets distributed and such longer period, if any, as is reasonably required to complete an audit and to resolve all questions concerning the expenditure of U.S. Government funds and the Grantee's compliance with the terms of this Grant Agreement. The U.S. Government follows generally accepted accounting principles and generally accepted government audit standards in determining whether there has been proper accounting for and use of U.S. Government funds. The Grantee shall make available any further information reasonably requested and available to the Grantee arising from any

issues or questions relating to expenditures of Grant funds or the Grantee's compliance with the terms of this Grant Agreement, or as the result of an audit.

C. Audits. The Grantee shall have annual audits of the Fund performed in accordance with U.S. generally accepted audit standards until the Fund is liquidated and its assets distributed. The audits shall be conducted by independent certified public accountants or independent licensed public accountants certified or licensed by a regulatory authority of a State or other political subdivision of the United States and approved by USAID (which approval shall be deemed to have been granted unless USAID objects within thirty (30) days after having received notice of a proposed accountant). Final audits will be included in the Fund's Annual Report.

D. Recipients of Technical Assistance. For the purpose of this provision, the phrase "recipient of technical assistance" includes U.S., host country, or third country entities that receive grants, technical assistance, training or feasibility studies from the Grantee. This provision does not apply to recipients who receive funds from the Grantee only as investments or loans.

The Grantee shall require that:

1) Each recipient of technical assistance provided by the Grantee shall keep: (a) separate accounts with respect to such assistance; (b) such records as may be reasonably necessary to disclose fully the amount and the disposition by such recipient of the proceeds of such assistance, the total cost of the project or undertaking in connection with which such assistance is given or used, and the amount and nature of that portion of the cost of the project or undertaking supplied by other sources; and (c) such other records as will facilitate an effective audit, and

2) Each recipient of technical assistance from the Grantee shall allow the Grantee, or any of its duly authorized representatives, including, where appropriate, the USAID Inspector General, access for the purpose of audit and examination to any books, documents, papers, and records of the recipient that are pertinent to assistance provided to it by the Grantee.

E. Investees. The Grantee will establish audit requirements for each Investee. The Grantee will require that Investees prepare periodic financial statements and, wherever practicable, Investees of a size to be determined by the Grantee (in consultation with USAID) will be required to have annual independent audits.

F. Compliance with Act. In addition to the above requirements, the Grantee shall comply fully with all provisions of the Act, including any provisions regarding independent private audits, GAO audits, and recordkeeping requirements.

## 3. EVALUATION

The Grantee shall participate in three evaluations of Grant activities, which shall be financed by USAID from resources outside of this Grant, one during the early implementation phase of the Grant, one at the mid-term of the Grant and one at the completion of the Grant. The parties will agree on the specific timing of each evaluation, which will be conducted by a contractor selected by USAID and will include: (a) evaluation of progress toward attainment of the objectives of the Grant; (b) identification and evaluation of problem areas or constraints which may inhibit such attainment; (c) assessment of how such information may be used to help overcome such problems; and (d) evaluation, to the degree feasible, of the overall development impact of the Grant.

## 4. PAYMENT

a. Requests for Advances. The Grantee may, at any time, request advance payments for anticipated expenditures for up to a ninety (90)-day period from the date of the request. To request an advance payment, the Grantee must submit requests to the USAID Payment Office via the electronic mail address: ei@usaid.gov with the notation "for immediate disbursement", and with a copy to the Agreement Officer's Representative (AOR). Advance requests submitted to the USAID Payment Office must include: 1) a Standard Form 1034 (SF-1034) Public Voucher for Purchases and Services Other than Personal (attached as Annex 4) and 2) the EAEF Periodic Advance and Disbursement Liquidation Request (Periodic Advance Request) Form (attached as Annex 5), detailing estimated expenditures over the projected ninety (90) -day period. Requests detailed on the EAEF Periodic Advance Request and accompanying SF-1034 must include the estimated disbursements to be made during the period covered by the request, the estimated balance of cash on hand from prior advance requests, and the advance amount being requested. The Grantee must print the statement "Request for Advance" in the box marked ARTICLES OR SERVICES on the SF-1034 form.

b. Advances. In order to obtain the initial advance under this Grant Agreement, the Grantee must request an advance for the initial ninety (90)-day period of projected cash disbursement needs (including any pre-award expenses reasonably and actually incurred in accordance with this Grant Agreement) immediately upon signing this award. Subsequent advance payment requests must be submitted no later than ten (10) business days prior to the date on which funds are needed. The Grantee may submit requests for advances to the USAID Payment Office as often as may be necessary to meet projected expenses. An advance may not exceed ninety (90) days of the Grantee's projected expenses. Should the Grantee have unexpended cash on hand carried over from a previous advance request, the Grantee shall provide a brief justification to the AOR for why such cash on hand should not be counted against the current advance payment request.

USAID's Payment Office will provide advance requests submitted by the Grantee to the AOR, who will promptly review such advance requests for reasonableness in order to provide

administrative approval to the Payment Office to process disbursement of the requested advance. The Payment Office will process all approved requests within five business days of its receipt of the AOR's approval.

c. Maintenance of Accounts. The Grantee is not required to maintain separate bank accounts for USAID funds. However, when advances are provided under this award, the Grantee must deposit such funds in a U.S. federally insured bank and be able to account for the receipt and expenditure of funds and interest earned on the advances provided by the U.S. Government separate and apart from Fund reflows and other sources of financing.

## 5. FINANCIAL REPORTING

The Grantee shall submit an initial quarterly financial report to the USAID Payment Office, with a copy to the USAID AOR no later than 120 days from date this Grant Agreement is signed, and shall provide subsequent financial reports at quarterly intervals thereafter. Quarterly reports will be in the form of the attached EAEF Quarterly Financial Report Form (attached as Annex 6), detailing quarterly and cumulative grant expenditures. Failure to provide these quarterly reports may result in the suspension, disruption, or termination of additional advance payments.

Within ninety (90) days following the termination of this Grant Agreement, the Grantee shall submit a final financial report showing total disbursements, total advances received, and any cash remaining on hand, which sums the Grantee shall distribute in accordance with General Provision 17 of this Grant Agreement, entitled "Termination and Liquidation of the Fund".

## 6. PROGRAM INCOME

Program Income shall be subject to the same terms and conditions as funds provided under this Grant Agreement; provided, however, that for the avoidance of doubt Program Income shall be available for payment of reasonable administrative expenses without being subject to the restriction set forth in Section E.7 of the Program Description, entitled "Administrative Expenses." For purposes of this Grant Agreement, "Program Income" includes both (1) interest earned on any funds received from USAID, or on any other Program Income, prior to their expenditure and (2) income earned by the Grantee on any activities financed by USAID or financed from any other income received by the Grantee from its investments, including, without limitation, loan repayments, proceeds from the sale of equity investments, fee income and other cash reflows.

## 7. REFUNDS

A. Funds obligated by USAID but not disbursed to the Grantee at the time the Grant Agreement expires or is terminated shall be de-obligated unilaterally by USAID, except for such funds encumbered by the Grantee in a legally binding and irrevocably committed transaction in furtherance of the purposes of this Grant Agreement. The Grantee shall refund to USAID any funds advanced to but not expended by the Grantee and not encumbered by a legally binding and irrevocably committed transaction in furtherance of the purposes of this Grant Agreement at the time of expiration or termination of the Grant Agreement.

B. If, at any time during the term of the Grant Agreement, or as a result of an audit, USAID determines that any funds provided under this Grant Agreement have not been spent in accordance with the terms of this Grant Agreement, the Grantee shall refund such amount to USAID no later than the liquidation of the Fund.

## 8. TERMINATION AND SUSPENSION OF THE GRANT

A. This Grant Agreement may be terminated for convenience at any time, in whole or in part, if both parties agree in writing that the continuation of the Grant would not produce beneficial results commensurate with the further expenditure of funds. Both parties shall agree upon termination conditions, including the effective date (the "Termination Date") and, in the case of partial terminations, the portion to be terminated. The agreement to terminate shall be set forth in a letter from the Agreement Officer to the Grantee.

B. If at any time USAID determines that the Grant should be suspended or terminated because either (1) there exist foreign policy grounds to suspend or terminate the Grant or (2) the Agreement Officer determines in writing that the Grantee has violated the terms of the Grant Agreement, then USAID may, upon written notice to the Grantee from the Agreement Officer, suspend this Grant Agreement and prohibit the Grantee from incurring additional obligations chargeable to this Grant other than necessary and proper costs in accordance with the terms of this Grant Agreement during the period of suspension (including, without limitation, administrative expenses). After such notice is provided, the parties shall hold good faith discussions concerning whether the Grant Agreement should continue to be suspended or should be terminated. If the parties have not agreed that the Grant Agreement should not be terminated within 30 days after USAID provides the Grantee with notice of its determination, the Agreement Officer may, upon a determination that there exist foreign policy grounds to terminate the Grant or that the Grantee has violated the terms of the Grant Agreement in a material respect, and upon the provision of written notice thereof to the Grantee, terminate this Grant Agreement and cancel that portion of this Grant which has not been disbursed or irrevocably committed to third parties.

C. Upon receipt of and in accordance with a termination or suspension notice as specified in either paragraph A or B above, the Grantee shall take immediate action to minimize all expenditures and obligations financed by this Grant and shall cancel such unliquidated obligations whenever possible. Except as provided below, no further reimbursement shall be made after the Termination Date. The Grantee shall within 30 calendar days after the Termination Date repay to USAID all unexpended USAID funds which are not otherwise obligated by a legally binding transaction applicable to this Grant. If USAID so elects and advises the Grantee in the written notice required above or any subsequent written notice, the Grantee shall follow the procedures in Section 16, "Termination and Liquidation of the Fund", of these General Provisions for the termination and liquidation of the Fund portfolio. Should the funds paid by USAID to the Grantee prior to the Termination Date be insufficient to cover the Grantee's obligations in a legally binding transaction, the Grantee may submit to USAID within 90 calendar days after the Termination Date a written claim covering such obligations. The Agreement Officer shall determine whether to pay and, if so, the amount(s) to be paid by USAID

to the Grantee in consultation with USAID's Office of Financial Management, Middle East Bureau and Office of the General Counsel; provided that the Agreement Officer shall not unreasonably deny any submissions for amounts to pay Grantee's obligations after the Termination Date. Subject to the foregoing, the Grantee shall be permitted to continue to pay reasonable compensation to its directors, officers, employees and agents during the period of winding down the Fund's operations with USAID funds (including, without limitation, reasonable and customary severance payments to such persons).

## 9. DISPUTES

A. Any disputes under this Grant shall be decided in writing by the USAID Agreement Officer within 60 days of the USAID Agreement Officer receiving notification of a dispute. The Agreement Officer shall furnish the Grantee a copy of the decision.

B. Decisions of the USAID Agreement Officer shall be final unless, within 30 days of receipt of the decision of the Agreement Officer, the Grantee appeals the decision to USAID's Deputy Assistant Administrator for Management. Any appeal made under this provision shall be in writing and addressed to Deputy Assistant Administrator for Management (DAA/M), U.S. Agency for International Development, Washington, D.C. 20523. A copy of the appeal shall be concurrently furnished to the Agreement Officer.

C. In order to facilitate review of the record by the Deputy Assistant Administrator for Management, the Grantee shall be given an opportunity to submit written evidence in support of its appeal. A hearing will also be provided, if requested by the Grantee. USAID shall notify the Grantee of the status of the Grantee's appeal within sixty (60) days of receipt of such appeal.

D. A decision under this provision by the Deputy Assistant Administrator for Management shall be final.

## 10. U.S. BUSINESS RELOCATION AND WORKERS RIGHTS

A. General. This clause is included in order to incorporate the prohibitions contained in Section 7028 of the Act.

B. U.S. Business Relocation. The Grantee shall not use any funds provided under this Grant to, or cause others to provide any financial incentive to a business enterprise located in the United States if such monies or benefits would be an inducement or incentive to such enterprise to relocate its business outside the United States and is likely to result in the reduction of the number of such enterprise's employees in the United States.

C. Workers' Rights. The Grantee shall not use any funds provided under this Grant to support, or to cause others to support, any program, project or activity that contributes to the violation of internationally recognized workers' rights, as defined in Section 502(A)(4) of the Trade Act of 1974 (and codified in 19 U.S.C., Paragraph 2462(a)(4)), of workers in the recipient country or any designated zone or area therein. The Grantee agrees not to take actions to prevent its local employees from lawfully exercising their right of association and their right to bargain

collectively. The Grantee further agrees to observe applicable laws relating to a minimum age for employment of children and acceptable conditions of work with respect to minimum wages, hours of work, and occupational health and safety. The Grantee shall not utilize forced or compulsory labor. The Grantee is not responsible under this provision for the actions of a government.

D. Compliance. The Grantee will include in its due diligence procedures (including the Investment Procedures) the requirement to collect information in order to determine whether a potential investment or activity by the Grantee is likely to result in activities that are inconsistent with the criteria of Section 7028 of the Act. The Grantee shall discuss with each Investee or recipient of technical assistance the language and intent of Section 7028 and shall require each such party to represent to the Grantee that it will not use the assistance provided by the Grantee in a manner which would be inconsistent with the criteria of Section 7028.

## 11. PROHIBITED TRANSACTIONS

A. Transactions with Certain Parties.

1) Unless authorized by the Agreement Officer, Grantee shall not knowingly enter into any subgrants or contracts under this Grant with a person or entity that is included on the "List of Parties Excluded from Federal Procurement or Non-procurement Programs" periodically furnished by USAID to the Grantee or available at the following link: http://www.epls.gov.

2) U.S. Executive Orders and U.S. law prohibit transactions with, and the provision of resources and support to, individuals and organizations associated with terrorism ("U.S. Terrorism Laws"). Accordingly, the Grantee shall comply with all U.S. Terrorism Laws and must not engage in transactions with, or provide resources or support to, individuals and organizations associated with terrorism, including individuals or entities that appear on the Specially Designated Nationals and Blocked Persons List maintained by the U.S. Treasury (online at: http://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx) or the United Nations Security designation list (online at: http://www.un.org/sc/committees/1267/aq_sanctions_list.shtml).

The Grantee shall not make any investment, provide any technical assistance, or engage in any other transaction or series of transactions involving expenditures in excess of $25,000 until (a) the Grantee has certified that the Grantee has reviewed the Investee (in the case of an investment), the recipient of technical assistance, or any other person or entity transacting directly with the Grantee, as applicable, including such party's majority shareholders, directors and senior officers ("Key Individuals"), against the publicly available lists specified above and confirmed that such entities and individuals are not named on such lists, or (b) if the Grantee has determined that a particular investment or transaction may involve a heightened level of risk relating to the ability of the Grantee to ensure compliance with this Section 10.A.2, the Grantee has submitted to USAID for terrorism vetting the completed "Information Form" attached as Annex 2, and USAID has provided its approval for the Grantee to transact with: (i) any Investee, recipient of

technical assistance or other person or entity transacting directly with the Grantee, that is a non-U.S. entity; and (ii) each Key Individual of the foregoing that is a non-U.S. entity. Grantee's adherence to these protocols is intended to assure its compliance with applicable Executive Orders and laws, which compliance is ultimately Grantee's responsibility.

For purposes of this clause, "non-U.S. entity" means (1) any person who is not a citizen or permanent legal resident of the United States; or (2) any entity that is not formed in the United States or for which fifty percent (50%) or more of the equity is owned or controlled by persons who are not citizens or permanent legal residents of the United States.

In the case of the Grantee making an equity investment in, or loan to, a "fund of funds", financial institution, or other entity that will utilize the Grantee's investment for purposes of making equity investments or extending loans to entities in Egypt, the Grantee shall include in its agreement with such Investee, language requiring that such Investee not utilize the funds provided to it by Grantee to enter into any transaction or series of transactions involving an investment or financing in excess of $25,000 unless it has implemented a due diligence process that includes a review of the recipient of such investment or financing, including such party's Key Individuals, against the publicly available lists specified above, and confirmed that such entities and individuals are not named on such lists.

B. Other Transactions. Grant funds shall not be used by the Grantee, and are not to be used by Investees, for any of the following:

1) the manufacture or sale of abortion equipment or the provision of abortion services, or the provision of involuntary sterilization or incentives for individuals to undergo sterilization;

2) the purchase, manufacture or sale of weapons, explosives, (including materials for explosives), military or surveillance equipment or services;

3) Police, law enforcement or military activities, provided that this provision does not prohibit investment in or loans to private security firms;

4) Gambling equipment, supplies for gambling supplies or any hotels, casinos or accommodations in which gambling facilities are to be located;

5) Activities that significantly degrade national parks or similar protected areas or introduce exotic plants or animals into such areas; or

6) Activities that relate to trafficking in persons, forced labor, the practice of prostitution or sex trafficking.

The Grantee shall include in its due diligence procedures (including the Investment Procedures) reasonable inquiry regarding these provisions and require each Investee to certify, as a condition for receiving funds or other assistance from the Grantee, that such funds or other assistance will not be utilized for any purpose prohibited by these provisions.

## 12. REPORTING AND EVALUATION

A. Annual Reports. No later than one year from the date of this Grant Agreement and annually thereafter, the Grantee shall make available to the public on an Internet Web site administered by the Fund an annual report ("Annual Report"), which shall include a comprehensive and detailed description of the Fund's operations, activities, financial condition, and accomplishments for the preceding fiscal year.

B. Progress Reviews. USAID and the Fund shall conduct progress reviews semiannually ("Semi-Annual Reviews") unless otherwise mutually agreed. The progress reviews will not be public meetings. Attendance will be restricted to only those U.S. Government personnel who have a legitimate need-to-know concerning the operations and status of the Fund. The focus of the progress reviews will be the exchange of information regarding the overall financial health and performance of the Fund, the current status of and future requirements for U.S. Government funding, the Fund's compliance with the terms of this Grant Agreement and the resolution of problems not resolved through the routine monitoring process outlined in subsection D below. Prior to each semi-annual review, the Fund will provide to USAID up-to-date information on each of the monitoring issues listed in Section F.2 of the Program Description. Each year, one semi-annual review should be held after publication of the Fund's Annual Report so that the Annual Report is available for the purposes of the review.

C. Office Visits. Approximately three times per year, at times agreeable to both parties, the Agreement Officer, accompanied by such other persons as USAID may determine, will visit the home office and, if applicable, field offices of the Fund, and a small sampling of the firms which have received loans or equity from the Fund. Fund management and USAID will agree upon the time for such visits and endeavor to finalize arrangements at least two working weeks prior to the visit. USAID will use its best efforts to insure that the field visits are brief and designed not to cause confusion or concern on the part of those entities in which the Fund has invested.

In preparation for these field visits, the Agreement Officer may request current financial information from the Fund including the financial statements reported to the Fund by investees and recipients of technical assistance. USAID does not intend that new reports be prepared for this purpose, but rather would expect to receive working reports that the Fund would routinely prepare or receive for its own information. USAID may request additional information related to the monitoring issues listed in subsection D below. The Grantee shall provide all such information as may be requested by USAID.

The parties may agree upon other visits or meetings on subjects of their choosing, and the Administration or Congress may request status information from the Fund from time to time if necessary.

## 13. CONFLICTS OF INTEREST

For the avoidance of doubt, the provisions set forth in this Section 13 of the General Provisions are subject to the requirements of the Act and section 501(c)(3) of the Internal Revenue Code.

For purposes of this Grant Agreement: (i) a "Direct Conflict" exists where any director or officer of the Grantee (or any spouse or child of any director or officer) is a partner, director, trustee, member, officer or employee of, or has a direct financial interest in, any other corporation, partnership, association or other organization with which the Grantee is considering entering into any contract, grant or any other transaction; and (ii) an "Indirect Conflict" exists where any director or officer of the Grantee (or any spouse or child of any director or officer) is a partner, director, trustee, member, officer or employee of, or has a financial interest in, any other corporation, partnership, association or other organization (an "Affiliated Entity") and the Grantee proposes to invest in or otherwise transact with an entity (a "Indirect Conflicted Entity") in which the Affiliated Entity has a direct or indirect financial interest.

In the event of any proposed transaction of the Grantee that involves either a Direct Conflict or an Indirect Conflict: (i) the conflicted director or officer of the Grantee shall disclose in writing to the Board of Directors all material facts as to his or her relationship or interest (or the relationship or interest of his or her spouse or child, as the case may be); (ii) the conflicted director or officer shall be recused from any vote by the Grantee with respect to its decision to enter into such transaction; and (iii) USAID approval shall be required with respect to such transaction (which approval shall be deemed to have been granted unless USAID objects within thirty (30) days after having received notice of a request for approval accompanied by reasonable detail regarding the nature of the proposed transaction and potential conflict of interest, provided that, if the Grantee notifies USAID that a shorter approval period is required in particular circumstances, then USAID shall endeavor diligently and in good faith to provide a response within the requested approval period).

Notwithstanding the foregoing, no USAID approval shall be required in the event of a proposed transaction involving an Indirect Conflict in circumstances where the value of the ownership interest in the Indirect Conflicted Entity that is held by the Affiliated Entity represents less than three percent of the total assets under management or equity capitalization, as applicable, of both the Indirect Conflicted Entity and the Affiliated Entity. (For example, Director A is a partner in Company X, which has $500 million assets under management. Company X holds a $2 million investment in SME Y, which has equity capitalization of $200 million. An investment by the Grantee in SME Y would not require USAID approval because Company X's ownership of SME Y represents less than 3% of both Company X's assets under management as well as SME Y's equity capitalization.) In the case of any proposed transaction described in this paragraph, the Grantee shall provide no less than ten (10) business days' notice to USAID of such transaction.

For the purposes of this Grant Agreement a "Dual Employee Conflict" exists where any director or officer of the Grantee (or any spouse or child of any director or officer) is a partner, director, trustee, member, officer or employee of, or has a direct financial interest in, any other corporation, partnership, association or other organization (a "Conflicted Service Entity") and

the Grantee enters into an arrangement for the provision of services to the Grantee by an individual that is also a partner, director, trustee, member, officer or employee of the Conflicted Service Entity (but in no event may such person be a director of the Grantee).

In the event of any proposed transaction of the Grantee that involves a Dual Employee Conflict: (i) the conflicted director or officer of the Grantee shall disclose in writing to the Board of Directors all material facts as to his or her relationship or interest (or the relationship or interest of his or her spouse or child, as the case may be); (ii) the conflicted director or officer shall be recused from any vote by the Grantee with respect to its decision to enter into such transaction; and (iii) USAID approval shall be required with respect to such transaction (which approval shall be deemed to have been granted unless USAID objects within thirty (30) days after having received notice of a request for approval accompanied by reasonable detail regarding the nature of the proposed transaction and potential conflict of interest, provided that, if the Grantee notifies USAID that a shorter approval period is required in particular circumstances, then USAID shall endeavor diligently and in good faith to provide a response within the requested approval period). For the avoidance of doubt, in no event will the Conflicted Service Entity receive any payments from the Grantee in connection with such transaction.

## 14. CHANGES IN BOARD OF DIRECTORS

No new member may be elected or current member reelected to the Board of Directors without the advice of the President of the United States of America, or his designee.

## 15. CHANGES IN CORPORATE STRUCTURE AND POLICIES; TAX-EXEMPT STATUS

A. Without the prior approval of USAID (which approval shall be deemed to have been granted unless USAID objects within thirty (30) days after having received notice of a request for approval accompanied by reasonable detail regarding the applicable action), the Grantee shall not:

1. make any change, other than non-material changes that are ministerial in nature, in its corporate structure, Certificate of Incorporation, By-Laws, Statement of Corporate Policies and Procedures, Accounting Policies, personnel compensation policies or environmental policies; or

2. make any change in its corporate structure, Certificate of Incorporation, By-Laws, Statement of Corporate Policies and Procedures, Accounting Policies, personnel compensation policies or environmental policies that would be contrary to the terms and conditions of this Grant Agreement.

B. The Grantee shall not make any change in its corporate structure, Certificate of Incorporation, By-Laws, Statement of Corporate Policies and Procedures, Accounting Policies, personnel compensation policies or environmental policies that would be contrary to the Act or other applicable legislation.

C. The Grantee shall not engage in any activities not permitted to be carried on under the Act or by a corporation exempt from federal income tax under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, or the corresponding provisions of any subsequent federal tax laws (the "Code"). Promptly following the execution of this Grant Agreement, the Grantee shall use best efforts to promptly obtain tax-exempt status under Section 501(c)(3) of the Code.

## 16. TERMINATION AND LIQUIDATION OF THE FUND

A. USAID shall establish the date (the "Windup Commencement Date") after which the Grantee shall not make any new commitments or investments and by which the Grantee shall commence the winding up of its affairs and sale of its assets on an orderly basis, in accordance with this Section 15.

B. The Windup Commencement Date shall occur no later than December 31, 2022.

C. Except under the circumstances described in subsection D below, and after consulting with the Grantee, USAID will notify the Grantee of the Windup Commencement Date at least one year before the Windup Commencement Date occurs. The Grantee shall not make any new commitments or investments after the Windup Commencement Date without the prior written consent of USAID.

D. Notwithstanding the provisions of subsection C. above, USAID may establish the Windup Commencement Date at any time, by delivery of written notice to the Grantee, that USAID has determined that either: (1) there has occurred a substantial violation of the terms of the Grant Agreement, or (2) there exist foreign policy grounds for termination and liquidation of the Grantee.

E. On or before the Windup Commencement Date, the Grantee shall propose to USAID a winding up and liquidation plan. The plan shall provide for the orderly liquidation of the Grantee's assets on as expeditious a basis as practicable, and shall include a target date by which the winding up and liquidation process will be completed. The plan may propose the sale of the Fund as an entity. USAID may either (1) approve the winding up and liquidation plan proposed by the Grantee, or (2) impose an alternative reasonable plan for the winding up and liquidation of the Grantee taking into consideration any legal binding commitments and agreements of the Fund and the anticipated wind-down expenses of the Fund (including, without limitation, reasonable compensation and/or severance payments to be made to the Fund's officers and employees). The winding up and liquidation schedule may be extended by USAID in writing for portfolio or developmental considerations. The Grantee will not transfer assets to subsidiaries or affiliates of the Grantee, or to any other party, except pursuant to arm's length transactions for reasonable value, unless otherwise approved in writing by USAID.

F. The Grantee will consult closely with USAID with respect to the preparation of its proposed winding up and liquidation plan, and its implementation of the plan approved or imposed by USAID.

G. In accordance with the Joint Explanatory Statement to the Act, the proceeds derived from the winding up and liquidation shall be distributed as follows: (x) fifty percent (50%) of the proceeds realized by the Fund from the liquidation of its assets should be returned to the United States Treasury, in a manner specified by USAID; and (y) the remaining fifty percent (50%) may be distributed as specified in the Grantee's winding up and liquidation plan as approved by USAID. USAID may direct the Grantee to distribute the proceeds of liquidation as they come available rather than on a "lump sum" basis upon the completion of the sale of all the Grantee's assets.

## 17. NONDISCRIMINATION

The Grantee agrees with respect to its employment practices in the U.S. during the term of this Grant Agreement not to discriminate, including against U.S. or Egyptian citizens or residents, on any basis protected by U.S. federal, state, or local law.

## 18. CORPORATE DOCUMENTS

The Grantee shall ensure that, during the term of this Grant Agreement, its Certificate of Incorporation and related corporate documents, current copies of which have been provided by the Grantee to USAID before execution of this Grant Agreement, will permit the Grantee to carry out all the terms and conditions of this Grant Agreement. To the extent there should exist any conflict between the terms of the Grant Agreement and the provisions of the Grantee's Certificate of Incorporation, By-Laws, Statement of Corporate Policies and Procedures or other corporate documents, the Grant Agreement terms shall prevail.

## 19. MARKING AND PUBLIC COMMUNICATIONS

A. Fund Identity. The Grantee agrees to use funds provided under this Grant Agreement to develop a unique identity logo and brandmark for the Fund, and once developed, the Grantee will use that logo and brandmark to identify, as appropriate in its discretion, all program or project reports, public communications, press releases, studies, analyses, Web sites/Internet activities (collectively, "Program or Communications Materials") partially or fully financed by the funds provided under this Grant Agreement.

B. USAID Identity. The "USAID Identity" is the official marking for USAID, comprised of the USAID logo and brandmark with the tagline "from the American people." The USAID Identity is on the USAID Web site at www.usaid.gov/branding. The Grantee must use the USAID Identity, of a size and prominence equivalent to any other identity or logo displayed in any Program or Communications Materials described in Section 19.A. of the General Provisions, unless otherwise approved by USAID (which approval shall be deemed to have been granted unless USAID objects within ten (10) business days after having received notice of a request not to display the USAID Identity) in the event that the Fund reasonably believes that the USAID Identity should not be displayed. If the USAID Identity cannot be displayed, the recipient is encouraged to otherwise acknowledge USAID and the support of the American people.

C. Public Notice. The Grantee is encouraged to give public notice of the receipt of this award and announce progress and accomplishments. The Grantee shall provide copies of notices or announcements to the Agreement Officer's Representative and to USAID's Office of Legislative and Public Affairs in advance of release, as practicable. Press releases or other public notices should include a statement substantially as follows: "The U.S. Agency for International Development administers the U.S. foreign assistance program providing economic and humanitarian assistance in more than 80 countries worldwide."

D. Disclaimer. The Grantee shall include the following disclaimer in any "public communication" in which the content has not been approved by USAID: "This study/report/audio/visual/other information/media product (specify) is made possible by the generous support of the American people through the United States Agency for International Development (USAID). The contents are the responsibility of the Egyptian-American Enterprise Fund and do not necessarily reflect the views of USAID or the United States Government."

E. Copies of Materials. The Grantee shall provide the Agreement Officer's Representative with two copies of all program and communications materials produced under this Grant.

## 20. AMENDMENT OF GRANT AGREEMENT

This Grant Agreement may be amended by formal amendment signed by the Agreement Officer and the Chairman of the Board or other authorized official of the Grantee.

## 21. NOTICES

Notices given by USAID or the Grantee or submissions made by either party to the other pursuant to the terms of this Grant Agreement, shall be sufficient only if in writing and delivered in person, mailed, or e-mailed as follows:

To Grantee: at the address listed below:

Mr. James A. Harmon
Chairman
Egyptian-American Enterprise Fund
c/o Caravel Management LLC
888 Seventh Avenue, 37th Floor
New York, NY 10106

To the USAID Agreement Officer: at the address listed below:

Assistant Administrator/Bureau for the Middle East
United States Agency for International Development
Rm. 4.09-005 RRB
1300 Pennsylvania Avenue, NW

Washington, DC 20523
With a copy to:
Agreement Officer's Representative/Bureau for the Middle East
United States Agency for International Development
1300 Pennsylvania Avenue, NW
Washington, DC 20523

Notices shall be effective when delivered in accordance with this provision, or on the effective date of the notice, whichever is later.

Annex 1

## Goal Statement and Monitoring and Evaluation Plan

**Goals:**

The goal of the Egyptian-American Enterprise Fund (EAEF) is to increase private sector investments in promising small and medium-sized enterprises (SMEs) in Egypt's economy, to promote and disseminate international commercial best practices, and to attempt to "crowd-in" investment in Egyptian SMEs from other sources. All of these objectives are consistent with USAID's goal of a more competitive, private sector-led, and inclusive Egyptian economy.

**Monitoring:**

The EAEF will provide the U.S. Government, the Government of Egypt and investors with responsive and technically rigorous data and analyses on project performance. Monitoring and Evaluation will occur on an on-going basis and inform progress toward attainment of the objectives of the Grant in the annual reports of the EAEF.

The EAEF will develop performance indicators to track progress on the impact of the EAEF's activities in Egypt. These performance indicators include the following and others mutually agreed to by USAID and the Fund:

- Return on investment for United States' capital invested in Egypt through the EAEF.
- Number of SMEs in Egypt benefiting from EAEF activities.
- Number of jobs in Egypt created at SMEs benefiting from EAEF activities, disaggregated by industry, occupation and income.
- Number of SME firms benefiting from EAEF activities with women or religious minorities in positions of significant leadership responsibility and/or with substantial equity ownership.
- Amount of capital invested in SME firms benefiting from EAEF activities by domestic and foreign investors.

A Performance Monitoring Plan, including EAEF performance indicators will be developed in consultation with USAID and agreed upon with the Agreement Officer's Representative within 120 days after the Grant enters into force.[1]

---

[1] The definition of SMEs in Egypt for the purposes of the EAEF's monitoring and evaluation activities will be defined in the EAEF Performance Monitoring Plan.

**Impact Evaluation:**

The EAEF shall participate in three evaluations of project activities, one during the early implementation phase, one at the mid-term and one at the completion of the project. The EAEF will work closely with USAID on the specific timing of each evaluation, which will be conducted by a contractor selected by USAID and will include: (a) evaluation of progress toward attainment of the objectives of the Grant; (b) identification and evaluation of problem areas or constraints which may inhibit such attainment; (c) assessment of how such information may be used to help overcome such problems; and (d) evaluation, to the degree feasible, of the overall development impact of the Grant.

**Capturing the Diversity of Impacts on Women-owned and other Minority-owned SME businesses:**

The EAEF plans to systematically target and track investments in and growth and performance of SMEs held by women and other minorities throughout all stages of the investment program as reflected in the Performance and Monitoring Plan. In addition, the EAEF will, to the extent reasonably practicable, disaggregate performance indicator results described in this Annex 1 to track EAEF activities and impacts specifically relating to women and minorities.

Annex 2

# Information Form

USAID
FROM THE AMERICAN PEOPLE

# PARTNER INFORMATION FORM

*(See Burden and Privacy Act Statements on Page 3)*

**Part I: Information About Proposed Activities**

1. Name of the prime contractor, grantee or recipient proposing the award or other assistance

2. Type of proposed award or other assistance (check one):
☐ Contract or Subcontract ☐ Grant or Subgrant ☐ Training ☐ Equipment ☐ Other

3. US$ amount and estimated start/end date of proposed award or assistance:
Dollar amount: $ Start: End:

4. Purpose of proposed award or assistance:

5. Organization proposed to receive award or other assistance:
a. Name:
b. Address:

| c. Telephone: | d. Fax: | e. Email: |
|---|---|---|

6. Information on key individuals associated with the organization named in 5 above, or, if no organization is listed, information on each individual to receive cash or in-kind assistance (including technical assistance). Use continuation sheets as necessary.

** = mandatory information.

| | | |
|---|---|---|
| A. Name (As in passport or other government-issued photo ID):** | | Government-issued photo ID number, type of ID and country of issuance:** |
| Place of birth:** | Date of birth:** (mm/dd/yyyy) | Rank or title in organization listed in #5 (if "key individual"):** |
| Other names used (may include nicknames, pseudonyms not listed under "Name"):** | | Gender: |
| Current employer and job title: | | Occupation: |
| Address of residence: | | Citizenship(s): |
| Email: | | Is the individual a U.S. citizen or legal permanent resident?** Yes ☐ No ☐ |

**Part II: Contractor/Grantee/Recipient Certification:**

Contractor/Grantee/Recipient certifies in submitting this form that it has taken reasonable steps (in accordance with sound business practices) to verify the information contained in this form. Contractor/Grantee/Recipient understands that the U.S. Government may rely on the accuracy of such information in processing this vetting request.

| Name: | Signature: |
|---|---|
| Title/Organization: | Date: |

**Part III: Submission details (to be completed by USG vetting official)**

| | |
|---|---|
| Vetting request number | |
| Staff member who initiated request | |
| Project name | |
| Date submitted for screening | |

## Partner Information Form Continuation Sheet for Part I, Section 6: List of Individuals (Use additional continuation sheets as necessary):

| | | |
|---|---|---|
| B. Name (As in passport or other government-issued photo ID):** | | Government-issued photo ID number, type of ID and country of issuance:** |
| Place of birth:** | Date of birth:** (mm/dd/yyyy) | Rank or title in organization listed in #5 (if "key individual"):** |
| Other names used (may include nicknames, pseudonyms not listed under "Name"):** | | Gender: |
| Current employer and job title: | | Occupation: |
| Address of residence: | | Citizenship(s): |
| Email: | Is the individual a U.S. citizen or legal permanent resident?** Yes ☐ No ☐ | |

| | | |
|---|---|---|
| C. Name (As in passport or other government-issued photo ID):** | | Government-issued photo ID number, type of ID and country of issuance:** |
| Place of birth:** | Date of birth:** (mm/dd/yyyy) | Rank or title in organization listed in #5 (if "key individual"):** |
| Other names used (may include nicknames, pseudonyms not listed under "Name"):** | | Gender: |
| Current employer and job title: | | Occupation: |
| Address of residence: | | Citizenship(s): |
| Email: | Is the individual a U.S. citizen or legal permanent resident?** Yes ☐ No ☐ | |

| | | |
|---|---|---|
| D. Name (As in passport or other government-issued photo ID):** | | Government-issued photo ID number, type of ID and country of issuance:** |
| Place of birth:** | Date of birth:** (mm/dd/yyyy) | Rank or title in organization listed in #5 (if "key individual"):** |
| Other names used (may include nicknames, pseudonyms not listed under "Name"):** | | Gender: |
| Current employer and job title: | | Occupation: |
| Address of residence: | | Citizenship(s): |
| Email: | Is the individual a U.S. citizen or legal permanent resident?** Yes ☐ No ☐ | |

| | | |
|---|---|---|
| E. Name (As in passport or other government-issued photo ID):** | | Government-issued photo ID number, type of ID and country of issuance:** |
| Place of birth:** | Date of birth:** (mm/dd/yyyy) | Rank or title in organization listed in #5 (if "key individual"):** |
| Other names used (may include nicknames, pseudonyms not listed under "Name"):** | | Gender: |
| Current employer and job title: | | Occupation: |
| Address of residence: | | Citizenship(s): |
| Email: | Is the individual a U.S. citizen or legal permanent resident?** Yes ☐ No ☐ | |

*** Indicates mandatory information*

## PARTNER INFORMATION FORM INSTRUCTIONS

**Part I**

Question 1 – Self-explanatory
Question 2 - Indicate the proposed type of mechanism to be utilized by placing a check mark on the line in front of the appropriate term
Question 3 – Enter the amount of award or assistance in U.S. dollars and indicate the start and end date of the program using a mm/dd/yyyy format
Question 4 – Indicate the purpose of the award or assistance. Use additional sheets and attach to page one of the vetting form if necessary
Question 5 a-e – Self-explanatory
Question 6 - "Key Individual" means (i) majority shareholders of the organization; (ii) members of the organization's governing body (e.g., members of the board of directors or board of trustees); (ii) the principal officer and deputy principal officer of the organization (e.g., executive director, deputy director, president, vice president); (iii) the program manager or chief of party for the USG-financed program; and (iv) any other person with significant responsibilities for administration of the USG-financed activities or resources. Complete for each of these four categories or indicate "N/A" if a category does not apply.

**Part II**

Individual filling out form must read the Certification and print their name where indicated, sign where indicated, print their title and the name of their organization where indicated, and print the date where indicated.

**Part III**

This section is not for individual's information and will be completed by the USG vetting official.

## PUBLIC BURDEN STATEMENT

Public reporting burden for this collection of information is estimated to average 15 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. The Agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the U.S. Agency for International Development, Office of Security (SEC), Washington, D.C. 20523-2600.

## PRIVACY ACT STATEMENT

The following statement is required by the Privacy Act of 1974 (5 U.S.C. 522). Information in this form is used to conduct screening of individuals and entities as required by applicable U.S. laws and implementing procedures to ensure that USAID funds do not inadvertently provide support to entities or individuals associated with terrorism. Public Law 109-446 §3(b)(2), 18 U.S.C. 2339A, 2339B, 2339C, Executive Orders 13224 and 12947, applicable Homeland Security Presidential Directives and other legislative or executive branch prohibitions on providing support or resources to, or engaging in transactions with, individuals or entities associated with terrorism constitute the authority for collecting this information. In addition, the Foreign Assistance Act of 1961 as amended (22 U.S.C. 2151 et seq.) provides USAID with broad discretion in granting foreign assistance and permits USAID to consider a range of foreign policy and national security interests in determining how to provide foreign assistance.

Disclosure of the information provided on this form will be done in accordance with USAID's System of Records Notice concerning the Partner Vetting System (72FR136) which establishes the routine uses and Privacy Act exceptions which apply to this system.

Annex 3

Preliminary Budget

| Administrative Expenses | Year One | Year Two | Year Three |
|---|---|---|---|
| Total Cumulative Allocation | $60,000,000 | $120,000,000 | $180,000,000 |
| Private Equity Management Fees (2%)* | $1,164,130 | $2,300,604 | $3,413,515 |
| **Fund Expenses** | | | |
| Furniture & Fixtures (computers, furniture, etc) | $77,279 | $15,000 | $15,000 |
| Operating Expenses (internet, phones, supplies, software, etc.) | $106,296 | $116,000 | $127,200 |
| Professional Fees (accounting, IT, legal, etc.) | $244,350 | $144,050 | $149,240 |
| Recruiting Costs | $163,750 | $37,500 | $0 |
| Rent (New York) | $154,000 | $165,000 | $176,000 |
| Cairo Office (all expenses) | $0 | $70,000 | $50,000 |
| Salaries & Benefits | $823,125 | $1,097,115 | $1,134,366 |
| Software | 1,500 | 1,500 | 2,000 |
| Travel | $223,200 | $366,000 | $397,050 |
| TOTAL ADMINISTRATIVE EXPENSES | $2,957,630 | $4,312,769 | $5,464,431 |
| Yearly percentage of total cumulative allocation | 4.93% | 3.59% | 3.04% |

*Assumes 100% of available funds (less expenses) invested with private equity managers.

Annex 4

Standard Form 1034 (SF-1034) Public Voucher for Purchases and Services Other than Personal

| | PUBLIC VOUCHER FOR PURCHASES AND SERVICES OTHER THAN PERSONAL | VOUCHER NO. [redacted] |
|---|---|---|
| U.S. DEPARTMENT, BUREAU, OR ESTABLISHMENT AND LOCATION [redacted] | DATE VOUCHER PREPARED [redacted] | SCHEDULE NO. [redacted] |
| | CONTRACT NUMBER AND DATE [redacted] [redacted] | PAID BY [redacted] |
| | REQUISITION NUMBER AND DATE [redacted] [redacted] | |
| PAYEE'S NAME AND ADDRESS [redacted] | | DATE INVOICE RECEIVED [redacted] |
| | | DISCOUNT TERMS [redacted] |
| | | PAYEE'S ACCOUNT NUMBER [redacted] |
| SHIPPED FROM: [redacted] | TO: [redacted] WEIGHT: [redacted] | GOVERNMENT B/L NUMBER [redacted] |

| NUMBER AND DATE OF ORDER | DATE OF DELIVERY OR SERVICE | ARTICLES OR SERVICES (Enter description, item # of contract or Federal supply schedule, and other information deemed necessary) | QUANTITY | UNIT PRICE COST | UNIT PRICE PER | AMOUNT(1) |
|---|---|---|---|---|---|---|
| [redacted] [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | $0.00 |
| [redacted] [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | $0.00 |
| [redacted] [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | $0.00 |
| [redacted] [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | $0.00 |
| [redacted] [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | $0.00 |
| (Use continuation sheet(s) if necessary) | | (Payee must NOT use the space below) | | TOTAL | | $0.00 |

| PAYMENT: [redacted] | APPROVED FOR [redacted] | EXCHANGE RATE [redacted] | DIFFERENCES [redacted] |
|---|---|---|---|
| PAID BY: PROVISIONAL / PARTIAL / FINAL / PROGRESS / ADVANCE | BY: [redacted] | | AMOUNT VERIFIED; CORRECT FOR [redacted] |
| | TITLE: [redacted] | | (SIGNATURE OR INITIALS) |

PURSUANT TO AUTHORITY VESTED IN ME, I CERTIFY THIS VOUCHER IS CORRECT AND PROPER FOR PAYMENT.

(DATE) (AUTHORIZED CERTIFYING OFFICER) [redacted] [redacted] (TITLE) [redacted]

ACCOUNTING CLASSIFICATION

| DOC NO | EARMARK | CURRCODE | CURRENCY | FUNDING |
|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

| CHECK NUMBER [redacted] | ON ACCOUNT OF U.S. TREASURY [redacted] | CHECK NUMBER [redacted] | ON (Name of Bank) [redacted] |
|---|---|---|---|
| CASH [redacted] | DATE [redacted] | PAYEE [redacted] | |

[1]When stated in foreign currency, insert name of currency.
[2]If the ability to certify and authority to approve are combined in one person, one signature only is necessary. Otherwise the approving officer will sign in the space provided, over his official title.
[3]When a voucher is receipted in the name of a company or corporation, the name of the person writing the company or corporate name, as well as the capacity in which he signs, must appear. For example: "John Doe Company, per John Smith, Secretary", or "Treasurer", as the case may be.

PER [redacted]

TITLE [redacted]

Previous edition usable NSN 7540-00-900-2234

PRIVACY ACT STATEMENT

The information requested on this form is required under the provisions of 31 U.S.C. 82b and 82c, for the purpose of disbursing Federal money. the information requested is to identify the particular creditor and the amounts to be paid. Failure to furnish this information will hinder discharge of the payment obligation.

Standard Form 1034
Revised October 1987

1987Department of the Treasury
1 TFM 4-2000 1034-121

Annex 5

EAEF Periodic Advance and Disbursement Liquidation Request (Periodic Advance Request) Form

## EAEF (Grant) Periodic Disbursement and Advance Liquidation Request

| Disbursement Period From: | | | | To: | |
|---|---|---|---|---|---|
| | 1. Cash advances received from USAID Inception to date | 2. Cash outlays by Enterprise Fund to date | 3. Carry - Over of Undisbursed Funds from Previous Advances (1 - 2) | 4. Planned Outlays this Period | 5. Net Cash Requested from USAID (4 - 3) |
| **Investment Outlays** | | | | | |
| Direct Investments | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Funds under Outside Management | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| **Sub Total** | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | | | | | |
| **Administrative Costs** | | | | | |
| Building Rent / Lease | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Furniture and Fixtures | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Operating Expenses (Internet, Phones, Supplies, Software) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Professional Fees (legal, PE Management) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Salaries & Benefits | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Travel | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Other | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| **Sub Total** | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | | | | | |
| **TOTAL** | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

**TOTAL NET REQUEST OF FUNDS** $0.00

"The Egyptian-American Enterprise Fund requests that USAID pay the above total net request of funds to the Egyptian-American Enterprise Fund and certifies that the amount requested is necessary to meet for the next ___ days (not to exceed 90) the Enterprise Fund's capital requirements for the promotion of the development of the private sector by means of loans and/or grants, equity investments, feasibility studies, technical assistance, training, insurance, guarantees, and/or other activities."

______________________________
Signature

Chief Financial Officer
Egyptian American Enterprise Fund

Annex 6

# EAEF Quarterly Financial Report Form

## EAEF (Grant) Quarterly Financial Report

| Quarter Ended: | | | |
|---|---|---|---|
| | A | B | (A+B) |
| | Previously Reported Expenditures | Expenditures For This Reporting Period | Cumulative Expenditures Reported To Date |
| **Investment Expenses** | | | |
| Direct Investments | $0.00 | $0.00 | $0.00 |
| Funds under Outside Management | $0.00 | $0.00 | $0.00 |
| **Sub Total** | **$0.00** | **$0.00** | **$0.00** |
| | | | |
| **Administrative Costs** | | | |
| Building Rent / Lease | $0.00 | $0.00 | $0.00 |
| Furniture and Fixtures | $0.00 | $0.00 | $0.00 |
| Operating Expenses (Internet, Phones, Supplies, Software) | $0.00 | $0.00 | $0.00 |
| Professional Fees (legal, PE Management) | $0.00 | $0.00 | $0.00 |
| Salaries & Benefits | $0.00 | $0.00 | $0.00 |
| Travel | $0.00 | $0.00 | $0.00 |
| Other | $0.00 | $0.00 | $0.00 |
| **Sub Total** | **$0.00** | **$0.00** | **$0.00** |
| | | | |
| **TOTAL** | **$0.00** | **$0.00** | **$0.00** |

The Egyptian-American Enterprise Fund affirms that the quarterly report of expenditures and cumulative totals in this report are true, complete, accurate and represent fairly the expenditures incurred by the Egyptian-American Enterprise Fund using Grant funds for the promotion of the development of the private sector by means of loans and/or grants, equity investments, feasibility studies, technical assistance, training, insurance, guarantees, and/or other activities. I am aware that any false, fictitious, or fraudulent information may subject me to criminal, civil, or administrative penalities. (U.S. Code, Title 18, Section 1001)

Signature Date

**Chief Financial Officer**
**Egyptian American Enterprise Fund**